**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

**KEN PETERMAN,**

Plaintiff,

v.

**ASHLEY CLARK,**

Defendant.

</td><td>

Case Number: _____

**COMPLAINT**

**[JURY TRIAL DEMANDED]**

</td></tr>
</table>

Plaintiff Ken Peterman ("Peterman" or "Plaintiff"), by and through his attorneys, alleges as follows against Defendant Ashley Clark ("Clark" or "Defendant"):

## NATURE OF THE ACTION

1.      This action arises from Defendant Ashley Clark's deliberate and malicious campaign to destroy Plaintiff Ken Peterman's career, reputation, and contractual relationships by fabricating false allegations of misconduct, including sex crimes.

2.      Until March 12, 2024, when he was wrongfully terminated, Peterman served as Chairman, President, and Chief Executive Officer ("CEO") of Comtech Telecommunications Corp. ("Comtech"), a global technology company providing satellite and wireless communications solutions, including classified work for the U.S. government.

3.      Clark was employed as Comtech's Chief of Staff.

4.     Peterman and Clark engaged in a fully consensual, mutual relationship, which Clark actively pursued.

5.     Clark sent Peterman affectionate messages such as "I love you," initiated personal interactions, and made clear her desire for a romantic relationship.

6.     At all relevant times, Comtech had no policy prohibiting consensual relationships between employees—including between supervisors and subordinates—nor did it require disclosure of such relationships. Peterman even confirmed such with Board members before he joined Comtech and after he joined.

7.     He also had disclosed the relationship.

8.     After Peterman ended the relationship and refused to grant Clark special treatment in the workplace, Clark retaliated by knowingly providing false and fraudulent information to Comtech in violation of New York State law, the Family and Medical Leave Act (FMLA) (29 U.S.C. § 2611 et seq.), and Comtech's policies to improperly obtain FMLA leave.

9.     While on FMLA leave, Clark stole documents and fabricated a knowingly false and defamatory Sham Complaint—a fraudulent legal document containing outrageous and baseless allegations, designed solely to destroy Peterman's personal and professional life.

10.     The Sham Complaint was never filed in any court and, as of this filing, remains nothing more than a false and malicious pretext to coerce Comtech into terminating Peterman.

11.     The Sham Complaint was a weapon of reputational destruction. Clark knowingly and maliciously accused Peterman of heinous and fabricated sex crimes.

12.     This was not a case of "he said, she said" — Clark knowingly and maliciously fabricated the outrageous and extreme claim that Peterman committed sex crimes against his second wife. Aside from her name, almost every detail was a complete fabrication.

13.     Clark's gross recklessness, disregard for the truth, and sole malice in making these allegations are undeniable.

14.     Before sending the Sham Complaint to Comtech, Clark never reported her allegations to the New York State Department of Labor ("NYDOL"), the Equal Employment Opportunity Commission ("EEOC"), law enforcement, or any government agency. She never once even contacted the police—who are responsible for investigating sex crimes.

15.     To this day, Peterman has never been contacted by any law enforcement or government agency regarding Clark's knowingly false allegations—further proving their complete fabrication.

16.     Clark strategically delivered the Sham Complaint directly to Comtech's Board and others, knowing it would cause reputational harm and force a swift, unjustified response. Clark did so, based on her inside knowledge and because she named Comtech as a defendant, falsely alleging that the company had engaged in illegal sex trafficking.

17.     In addition to falsely accusing Peterman of sex crimes, Clark fabricated the claim that their relationship was "clandestine" and hidden, when in fact it was well known within Comtech.

18.     Clark timed her false allegations to coincide with escalating tensions between Peterman and Comtech's Board due to his ongoing whistleblowing activities. Peterman had reported corporate governance failures, accounting irregularities, and severe internal control deficiencies at Comtech—making him a target for retaliation.

19.     Months before his wrongful termination, Clark became aware that Peterman had raised whistleblower concerns directly to Larry Waldman, as well as a third party with oversight

responsibilities. She also learned that other executives reported similar concerns. Peterman's Whistleblower concerns included:

- Concerns about Judy Chambers' Conflicts of Interest and Breach of Fiduciary Duty to Comtech;

- Concerns about Internal Control Weaknesses and Questionable Accounting Practices;

- Concerns about Improper Accounting and Revenue Recognition, particularly regarding an international distributor.

20.    Clark exploited Waldman's animosity toward Peterman and deliberately timed the release of her Sham Complaint to provide him with a pretext to have Peterman removed.

21.    Clark's intimate knowledge of Comtech's Board dynamics—including individual members' biases, past decisions, and susceptibility to manipulation—allowed her to weaponize her false allegations for maximum impact.

22.    Clark demanded Peterman's immediate termination and sought financial compensation from Comtech in exchange for her silence.

23.    The Board, displaying gross recklessness and an egregious violation of its fiduciary duties, capitulated to Clark's false claims and published a defamatory press release on March 13, 2024—just four business days after the March 6, 2024 date listed on Clark's Sham Complaint.

24.    Upon receipt of the Sham Complaint, the Board rushed through a non-legitimate investigation. Waldman—one of the primary subjects of Peterman's whistleblower complaints—immediately took control and used the false allegations as a pretext to remove Peterman.

25.     The investigation lacked legitimacy, as key executives who worked closely with both Peterman and Clark were never interviewed.

26.     Clark, knowing she had fabricated her claims and violated the law, refused to be interviewed by the investigator.

27.     Waldman and Board member Judy Chambers, also an Audit Committee member, lied and manipulated other Board members by concealing the fact that they had previously approved Peterman's relationship with Clark.

28.     In flagrant disregard of its duties, the Board ignored that just weeks before his wrongful termination, Peterman had passed a rigorous U.S. Department of Defense polygraph, a requirement for his Top Secret/SCI clearance.

29.     These tests—extensively relied upon by the U.S. government and Comtech—detect undisclosed relationships, ethical lapses, and vulnerabilities to blackmail.

30.     Peterman's polygraph result—"No Deception Indicated"—contradicted any suggestion that his relationship with Clark was clandestine or concealed.

31.     Comtech's security clearances were never in jeopardy.

32.     Clark knew, or was grossly reckless in not knowing, that Comtech would terminate Peterman and issue a widely distributed defamatory press release, falsely implying that he engaged in serious criminal, ethical and professional misconduct.

33.     Clark's calculated falsehoods triggered widespread media coverage, ensuring that her defamatory claims would be permanently tied to Peterman's name. Despite knowing that her allegations were false, Clark has taken no steps to correct, retract, or prevent the ongoing republication of the defamatory press release.

34.    Clark's sole motive was revenge—her false allegations were not based on any legitimate grievance but were fabricated to destroy Peterman for ending their relationship.

35.    Over time, Peterman's whistleblower reports have been validated:

- October 30, 2024: Comtech admitted in an SEC filing that it had failed to maintain proper internal controls and had multiple material weaknesses.

- November 2024: Two members of the Audit Committee, including Chambers, resigned under pressure from activist shareholders who uncovered details of Peterman's whistleblowing.

- December 11, 2024: Comtech failed to file its Form 10-Q on time, citing anticipated significant financial changes—including issues Peterman had raised before his termination.

- January 15, 2025: Comtech announced a $17.4 million charge to reserve a receivable—one of the accounting concerns Peterman had warned about before his retaliatory termination.

- January 16, 2025: The U.S. Department of Labor opened an investigation into Comtech under the Sarbanes-Oxley Act (18 U.S.C. § 1514A), directly tied to Peterman's whistleblower reports.

36.    Waldman remains Chairman of Comtech's Audit Committee and continues to lie to every director on the Board, as well as to its independent auditors.

37.    Clark's conduct was driven by sole malice, as her allegations were not based on any legitimate grievance but were fabricated entirely as an act of revenge against Peterman for ending their consensual relationship. As a result, Peterman suffered severe financial losses, wrongful termination, and lasting reputational harm, rendering him unemployable in his field.

38.     Through this action, Peterman seeks compensatory damages, punitive damages, and injunctive relief for tortious interference with contract, conversion, defamation per se, defamation by implication, attempted coercion and wrongful interference, intentional infliction of emotional distress, and negligent infliction of emotional distress.

## JURISIDICTION AND VENUE

39.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) (Diversity Jurisdiction), as the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendant.

40.     Venue is proper in the Southern District of New York ("SDNY") pursuant to 28 U.S.C. § 1391(b)(2) as key events, including the widespread publication and republication of the defamatory statements, occurred in this district.

41.     Plaintiff's reputation and employability were irreparably damaged within SDNY, where the impact of the Sham Complaint, defamatory press release and its republications were widely disseminated to White Hat Capital Partners LP ("White Hat"), and its partner, Magnetar Capital. White Hat, controls more than 75% of Comtech and is based in the SDNY.

42.     Both Clark and Comtech's defamatory statements were drafted in the SDNY and specifically directed toward and read by an audience in SDNY, a global financial hub where Plaintiff's professional relationships, industry standing, and future employment prospects have been permanently harmed.

## PARTIES

43.     Peterman is a United States citizen domiciled and residing in California. He was Chairman of the Board and CEO of Comtech, a Delaware corporation headquartered in Arizona,

44.     Upon information and belief, Clark is a resident of New York and a former senior executive of Comtech, where she served as Chief of Staff and worked closely with Peterman.

## FACTUAL BACKGROUND AND ALLEGATIONS

### I. Peterman's Recruitment to Comtech: A High-Integrity Senior Executive

45.     Before Defendant's false and malicious allegations and Peterman's wrongful termination, Peterman was a highly respected executive in the aerospace and defense technology sector, widely recognized for his exceptional leadership, high ethical standards and integrity.

46.     Prior to joining Comtech, Peterman served as President of Viasat's Government Systems ("Viasat") business from 2013 to 2021, where he led one of the fastest-growing satellite and defense businesses in the United States. Viasat was a direct competitor of Comtech.

47.     Peterman was widely recognized for his transparency holding a Top Secret/SCI security clearance from the U.S. Government—a level of trust granted only to individuals of integrity who pose no risk of blackmail or coercion due to undisclosed secrets.

48.     In early 2022, Peterman was contacted by Crist | Kolder Associates ("Crist Kolder"), an executive search firm, to interview for a director position on Comtech's Board.

49.     Comtech is a global technology company specializing in terrestrial and wireless network solutions, next-generation 9-1-1 emergency services, satellite and space communications technologies, and cloud-native capabilities for commercial and government customers worldwide.

50.     Comtech's common stock is publicly traded on the NASDAQ exchange, and its corporate headquarters is in Chandler, Arizona.

51.     Crist Kolder informed Peterman that Comtech had recently settled a high-profile activist fight with a large shareholder who had publicly sought to remove Board members Waldman and Chambers.

52.     Peterman was assured by Crist Kolder that Comtech's Board was committed to recruiting the most qualified individuals and that the search process was entirely merit-based. They emphasized that Comtech had given them explicit instructions to not be "encumbered by off-limit issues."

53.     These representations were particularly important to Peterman. As a senior executive with a demanding career that required extensive travel, he maintained multiple relationships with several females.

54.     In the past, Peterman had met, dated, and ultimately married his second wife, Julie Peterman ("Peterman's Second Wife"), while working for a prior employer.

55.     Given his personal circumstances, it was critical for Peterman to confirm that Comtech had no moral or fiduciary objections to his lifestyle.

56.     Relying on assurances that there were no "off-limit" issues, Peterman personally asked for and conducted a comprehensive review of Comtech's employment and harassment policies, including its Standards of Business Conduct ("SOBC"), public SEC filings, and publicly available website (collectively, the "Policies").

57.     Peterman's thorough review confirmed that Comtech had no prohibitions, restrictions, or disclosure requirements related to his lifestyle, open marriage, or consensual romantic relationships—including those involving subordinates.

58.     To further ensure his understanding, Peterman directly asked a Board member and a C-level executive, who explicitly confirmed that his understanding and interpretation of Comtech's policies and practices were accurate.

59.     Comtech completed a thorough business and personal background check before appointing Peterman to its Board on or about May 10, 2022.

60.     As part of this appointment, Peterman executed a legally binding Indemnification Agreement ("Indemnification Agreement"), which provided him with significant legal contractual protections, including advances and indemnification of legal fees, against any claims, legal actions, or liabilities arising from his service to Comtech.

61.     The Indemnification Agreement was specifically designed to shield executives from baseless or retaliatory claims, ensuring that executives like Peterman could make difficult business and governance decisions without fear of unjust reprisal.

62.     On or about July 26, 2022, in recognition of his industry expertise and strategic vision, Peterman was elected Chairman of Comtech's Board.

63.     On or about August 11, 2022, Peterman was hired as an employee of Comtech and appointed to the additional roles of CEO and President.

64.     On or about September 12, 2022, Peterman and Comtech formalized his employment relationship through a legally binding Employment Agreement ("Employment Agreement"). Together with the Indemnification Agreement (collectively, the "Agreements"), these documents provided Peterman with significant protections and financial benefits throughout his tenure at Comtech.

65.     However, despite these contractual protections, Peterman's tenure was wrongfully cut short on March 12, 2024, as a direct result of Defendant's false and malicious allegations.

**II. Clark's Recruitment to Comtech and Unrestricted Access to Comtech's Board**

66.     On or about September 26, 2022, after an extensive and highly selective interview process, Defendant Clark was hired as Comtech's Chief of Staff.

67.     Clark was vetted by multiple senior executives, including Comtech's Chief People Officer ("CPO") Jennie Kerr, who assured Peterman that she was an ideal candidate.

68.     Clark was described to Peterman as a professional who could be trusted with high-level responsibilities, sensitive information, and the integrity required to uphold Comtech's culture of ethics and corporate compliance.

69.     Despite holding the title of "Chief of Staff," Clark's position conferred no independent operational authority or strategic decision-making power.

70.     Clark's role was primarily administrative, involving scheduling, logistical coordination, and providing executive support to Comtech's C-level officers, including Peterman and the Board. She managed calendars, handled confidential communications, processed both executive paperwork and digital forms, and had access to high-level corporate information.

71.     Clark's position gave her direct insight into Comtech's corporate policies, compliance obligations, and decision-making structures.

72.     Through this role, she also gained personal knowledge of Comtech's procedures for issuing press releases and making regulatory disclosures to the SEC.

73.     Independent of any personal relationship with Peterman, Clark frequently traveled with him and several female C-level executives, including Comtech's Chief Operating Officer ("COO") Maria Hedden and Chief Strategy Officer ("CSO") Nicole Robinson.

74.     Clark also traveled and worked closely with other senior executives, including Chief Technology Officer ("CTO") Anirban Chakraborty, CFO Michael Bondi and Chief Legal Officer ("CLO") Don Walther.

75.     Clark had access to historical files on former C-level executives and Board members, giving her additional insight into the remaining Board members. These records revealed past Board disputes, power struggles, and patterns of decision-making, allowing Clark to anticipate how individual members would react to allegations.

76.     In particular, Clark learned that Waldman and Chambers had previously misled other Board members to manipulate corporate outcomes, reinforcing her belief that they could be leveraged to achieve her desired result—Peterman's termination.

77.     She also traveled and worked closely with other executives who ran key operations such as Jay Whitehurst, President of Comtech's Trusted Location product line and Comtech's Chief Strategy Officer.

78.     Clark completed Comtech's SOBC training and formally certified that she had read and agreed to abide by Comtech's Policies.

79.     Following this training, Clark signed certifications acknowledging that she had received and read Comtech's policies, which explicitly prohibited employees from accessing, removing, or misusing confidential company information and required them to safeguard proprietary materials from unauthorized disclosure.

80.     By completing Comtech's training and reading the policies, Clark became personally aware that Comtech did not have a policy prohibiting consensual relationships between executives and subordinates, nor did it require disclosure of such relationships.

81.     Clark acknowledged Comtech's OpenLine telephone number (866-512-7175) and website portal, both maintained by an independent third party, which provided all employees with a secure and confidential process to report any concerns.

82.     As part of her onboarding, Comtech's Information Technology and Systems department issued Clark a company laptop that mirrored Peterman's system, granting her unrestricted access to his emails, documents, corporate records, and personal materials.

83.     Clark was entrusted with Peterman's user ID and passwords, allowing her full access to his confidential information.

84.     Through this trusted access, Clark became intimately familiar with every aspect of Peterman's business dealings and personal affairs.

85.     Clark also had unrestricted access to the Board, where she played a central role in arranging and facilitating leadership activities and events.

86.     Clark regularly handled the Board's personal arrangements, including meal orders, travel logistics, and coordinating meetings.

87.     Clark frequently communicated with Board members via phone, text messages, emails, and in-person discussions at various Board meetings.

88.     Through these interactions, she gained direct insight into the internal workings of the Board, individual Board members' perspectives, and their potential biases.

89.     Clark ingratiated herself with Board members, cultivating personal relationships and engaging in private conversations about their families, personal concerns, and internal company affairs. By doing so, she positioned herself as a trusted insider with direct access to key decision-makers.

90.    Clark regularly coordinated with Waldman, frequently assisting him with scheduling, strategic planning, and arranging multiple dinners with Board members and Peterman. Through these interactions, Clark developed a relationship with Waldman and gained an understanding of his views and priorities.

91.    In or around August 2023, Clark learned that Waldman had created a Special Committee that effectively bypassed Peterman, negatively impacting his ability to lead or participate in critical corporate governance, business, and financial decisions.

92.    Clark also learned that this Special Committee resulted in Waldman receiving additional financial stipends, creating a perverse financial incentive for him to retain control rather than deferring to more experienced Board members such as Ellen Lord and Bruce Crawford. This created instability which Clark would later exploit.

93.    Clark learned that in January 2024, Board member Mark Quinlan's investment fund, White Hat Capital Partners LP ("White Hat"), and its partner, Magnetar Capital, had invested an additional $45 million into Comtech, bringing their total investment to $166.5 million by January 31, 2024.

94.    Clark learned that during White Hat's restructuring, tensions grew as Peterman challenged Waldman's oversight and raised whistleblower concerns..

95.    Clark learned that during the White Hat restructuring process, Waldman and Peterman became significantly at odds because Peterman was not only criticizing Waldman's oversight but also whistleblowing to Waldman and others.

96.    Clark became aware that Board and Audit Committee member Wendi Carpenter had personally experienced a failed marriage due to her spouse's infidelity. She also knew that

Carpenter held strong personal opinions regarding extramarital affairs and was prone to emotional reactions when confronted with such matters.

97.    Clark learned that Chambers disliked both Carpenter and Quinlan.

98.    Clark discovered that Board member Dr. Yacov Shamash had been placed on the Board at Waldman's request, contributed little value, and always voted in alignment with Waldman's interests.

99.    Clark assisted Board and Audit Committee members Ellen Lord and Bruce Crawford in coordinating and aligning their calendars when they joined the Board in July 2023.

100.    Clark knew that Lord and Crawford were new to Comtech and were not privy to Board discussions or decisions made before their arrival.

101.    Over the course of her employment at Comtech, Clark coordinated approximately 53 Board meetings. Clark also coordinated over 21 Audit Committee meetings, 19 executive sessions of Independent Directors, 9 Nominating and Governance Committee meetings, 11 Compensation Committee meetings, and 4 Cyber Committee meetings.

102.    Clark learned that minutes of Board meetings, particularly those prepared or reviewed by Sidley Austin LLP, were often delayed, rushed, and contained errors and its attorneys almost never documented Audit Committee investigations of Policy violations. She learned that sometimes, board minutes would be retroactively changed.

103.    Through all her interactions, Clark acquired a deep understanding of the Board's internal dynamics, the individual biases of its members, and the gaps in their knowledge. Clark knew which Board members lacked key information, which ones held strong emotional views, and which could be easily influenced.

104.    Clark had obtained direct access to Comtech's internal conflicts and tensions, including Peterman's and other executives' whistleblowing activities, Board governance disputes, and internal divisions. She became aware of corporate vulnerabilities and had unfiltered communication channels, giving her unique insider knowledge of critical corporate affairs.

105.    At no point was Clark ever restricted from raising concerns, reporting alleged violations, or addressing any grievances with Comtech's Board, its legal department, or the company's independent and confidential reporting mechanisms. If she had any legitimate concerns, she had every opportunity to report them.

106.    Clark later exploited this knowledge when she fabricated her Sham Complaint, tailoring her false allegations to trigger an immediate and emotional reaction from the Board.

107.    When Peterman ended their relationship, Clark weaponized her access and insider knowledge, leveraging her direct connections to the Board, her familiarity with the company's vulnerabilities, and her unrestricted access to Peterman's personal and professional life.

**III. Comtech Had No Policy Prohibiting Workplace Relationships or Personal Lifestyles**

108.    Even after conducting his own review of Comtech's Policies and receiving assurances during the director interview process, Peterman sought additional confirmation after joining the Board and, later, after becoming an employee.

109.    Through discussions with a Board member and a C-level executive, Peterman further verified that Comtech openly permitted employees to engage in consensual workplace relationships, including those involving subordinates.

110.    Peterman also learned that multiple C-level executives had previously hired or worked alongside immediate family members and other relatives, further reinforcing Comtech's longstanding acceptance of workplace relationships.

111.    These explicit assurances—combined with Comtech's own written policies and the representations made during Peterman's director interview process—made it unequivocally clear that Comtech imposed no restrictions on consensual relationships between employees.

112.    Nevertheless, out of professionalism, Peterman chose not to openly discuss his personal relationships with colleagues. While he understood that Comtech had no prohibitions against such relationships, he recognized that some employees might have personal opinions or discomfort regarding workplace romances.

113.    Peterman's lifestyle—and his relationship with Clark—was neither secret nor clandestine within Comtech.

114.    Through ongoing discussions, Waldman became personally aware of the relationship. These conversations frequently included discussions about Peterman's lifestyle, his potential and actual relationship with Clark, and Waldman's own family situation.

115.    In March 2023, Peterman directly raised the topic of a potential relationship with Clark to Waldman.

116.    During this discussion, Peterman specifically asked Waldman whether such a relationship would violate any company policy including the SOBC and made clear that if there were any concerns, he would not pursue it.

117.    Waldman unequivocally confirmed that no company policy prohibited such relationships, that no disclosure or approval was required, and reassured Peterman that he would inform or remind other members of the Audit Committee and/or Board as a courtesy.

118.    Peterman was pleased with this answer as he had a preference for not discussing his personal lifestyle and recognized that an open marriage is still somewhat not traditional.

119.    Initially, conversations between Waldman and Peterman were friendly and cordial. Discussing a wide range of topics from business, politics, to personal situations.

120.    Waldman and Peterman frequently discussed the Clark and Peterman relationship including at meetings at Blackstone's Steakhouse, Oheka Castle, and other upscale restaurants.

121.    Waldman would often inquire, "How is she doing?" and at other times comment, "I don't know how you do it."

122.    Waldman regularly initiated these dinner meetings whenever Peterman was in New York. During these meetings, Waldman repeatedly pressured Peterman to use Comtech's expense account to purchase takeout desserts for Waldman's wife.

123.    As Lead Independent Director and Chairman of the Audit Committee, Waldman had a supervisory role over Peterman. He also was responsible for oversight of the SOBC.

124.    Given this authority, Peterman reasonably believed that complying with Waldman's requests was authorized. Waldman frequently remarked, "You should do whatever it takes to make your current wife and Clark happy—but bringing home dessert is what keeps my wife happy."

125.    At Waldman's insistence, Peterman submitted these expenses through his expense report, which CFO Bondi reviewed and approved.

126.    In hindsight, it appears that Waldman may have been exploiting Peterman's for personal gain, raising serious questions about the true motivations behind his actions. This misuse of authority of expense reports suggests that Waldman's intentions were not only self-serving and unethical but also likely a violation of the SOBC.

127.    Waldman would later deny that Peterman reported any concerns about Bondi's failures to properly oversee internal controls pursuant to Sarbanes-Oxley and Bondi's attempts to

artificially boost a financial metric called EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization).

128.    CFO Bondi also reviewed expense reports for Clark's expenses and was aware of Peterman's interactions with Clark.

129.    Peterman's lifestyle became known to some within Comtech.

130.    More than a year into his tenure as CEO, a married C-level executive casually remarked, "I love your lifestyle and need to join the club—I want to play, too."

131.    Peterman also became aware that another married C-level executive, who had been with Comtech before his arrival, openly engaged in a similar lifestyle without consequence.

132.    Peterman's conversations with Waldman and interactions with other C-level executives reinforced his understanding that Comtech had no rules or policies prohibiting consensual workplace relationships—whether dating, romantic, or sexual.

133.    Waldman would later conceal this understanding from other Board members, falsely portraying Peterman's relationship as undisclosed and improper.

134.    These discussions aligned with Peterman's prior review of Comtech's Policies before joining the company, as well as statements from another Board member confirming the absence of any restrictions.

135.    Unlike Peterman, both married C-level executives remained employed without scrutiny or consequence. This further demonstrates that Comtech did not prohibit workplace relationships and that Peterman's termination was a pretext driven by Clark's false allegations rather than any alleged policy violation or dishonesty by Peterman.

**IV. Clark's Relentless Pursuit of Peterman and Initiation of a Personal Relationship**

136.    After joining Comtech, Clark actively pursued a romantic relationship with Peterman, despite his initial reluctance.

137.    Clark would travel frequently with Peterman ensuring she was present during meetings, travel, and business gatherings.

138.    Undeterred, Clark continued seeking his attention, displaying affection, and embedding herself in both his personal and professional life.

139.    On or about April 23, 2023, Clark began working closely with Comtech's newly hired CLO, Don Walther.

140.    Walther had known Peterman for many years, having worked with him at a previous company where they developed a professional and personal rapport. Beyond their work relationship, Walther had occasionally socialized with Peterman outside of the office, giving him firsthand knowledge of Peterman's personal lifestyle.

141.    Around the same time, Clark facilitated the hiring of Peterman's Second Wife as a consultant due to the increased workload from Comtech's expanding executive staff.

142.    Although no policy required disclosure or Board approval, Peterman proactively asked Walther to disclose the hiring to the Board.

143.    Peterman's Second Wife, who was never the victim of sex crimes committed by Peterman, remained with Comtech through late 2024 before departing.

144.    At around this same time CLO Walther joined, Peterman's mother passed away.

145.    Clark exploited this personal tragedy to deepen her connection with him, positioning herself as a confidante and emotional support.

146.    Clark sent messages of encouragement, expressed concern for his well-being, and made herself indispensable in his daily routine.

147.    Over time, Clark's infatuation with Peterman became increasingly apparent. Her behavior was openly observable in meetings, presentations, work-related travel, and office visits.

148.    Clark made no effort to conceal her romantic interest in Peterman. Her conduct was noticed by colleagues, executives, and Board members alike.

149.    Clark would linger near Peterman at company functions, deliberately sought opportunities to sit beside him, and projected an attitude of entitlement to his time and attention..

150.    One C-level executive—who frequently traveled with both Peterman and Clark—stated, "Although I was not in the room where it happened, it was obvious to everyone what was going on."

151.    In May 2023, while riding in a car together, Clark voluntarily disclosed to Peterman that she had casually mentioned her romantic interest in him to Board member Judy Chambers during a routine scheduling discussion.

152.    Chambers was also a member of the Board's Audit Committee and was aware of Peterman's whistleblowing activities, as she was the subject of one of Peterman's reported complaints.

153.    Clark told Peterman that Chambers knew about their relationship, confirmed no policy prohibited it, and advised discretion. Yet, Chambers would later lie, denying any prior knowledge to justify Peterman's termination.

154.    After Clark relayed this conversation, Peterman shared with her his prior discussion with Waldman regarding the same matter.

155.    That evening, when they arrived at Peterman's hotel, Clark initiated physical affection, hugging him and kissing him goodbye before heading to her own hotel.

156.    Over time, Clark and Peterman engaged in a brief, fully consensual relationship that began on or about July 2023 and ended by early December 2023.

157.    At no point was the relationship coerced, nor was Clark subjected to any pressure, threats, or conditions regarding her employment.

158.    Clark's actions throughout this period were wholly inconsistent with those of an individual who had been subjected to sexual crimes. She voluntarily sent affectionate messages, initiated physical contact, and actively sought deeper personal involvement with Peterman.

159.    For instance, during this period, Clark sent Peterman a text message stating, "I love you." At one point, Clark even arranged a dinner to introduce Peterman to her mother, further demonstrating the consensual and voluntary nature of their relationship.

160.    Clark's mother, who lived in Arizona, even arranged for Peterman to use her home address while he searched for his own apartment in the area.

161.    Both Peterman and Clark mutually agreed to keep their relationship private within the workplace to avoid any perception of favoritism, office gossip, or unnecessary distractions. This decision was mutual and voluntary—not one imposed by Peterman.

**V. The Breakup and Clark's Increasingly Erratic and Hostile Behavior**

162.    On or about September 27, 2023, a series of off-hours events created tension between Peterman and Clark, leading to Peterman decisively ending the relationship.

163.    That evening, Clark invited Peterman to a hotel room under the pretense of showing him a birthday gift she had purchased for herself.

164.    Once inside the hotel room, Clark undressed and revealed that she had pierced her nipples with large safety pins, presenting this as part of an intimate gesture.

165.    Peterman was immediately repulsed, finding the display both unsettling and inappropriate. He expressed his discomfort, making it clear that he was unsettled.

166.    Suddenly, Clark exacerbated the situation by jumping onto Peterman with significant force, catching him off guard.

167.    Due to the significant physical disparity, Peterman, who is leaner and almost 70 years old, immediately struggled to breathe.

168.    Peterman asked Clark to stop, and she did.

169.    In the ensuing conversation, Clark made disclosures about her personal lifestyle, stating that Peterman was the first white guy she had been with in over five years.

170.    Clark also informed Peterman that she regularly engaged in relationships with multiple lesbian partners.

171.    These new revelations further unsettled Peterman and confirmed that, from his perspective, the relationship had effectively ended that night, despite the occasional attempt at reconciliation by Clark that followed.

172.    Clark, upset by Peterman's reaction, begged him to reconsider. When he firmly refused, her demeanor shifted instantly from distress to resentment.

173.    In the weeks that followed, Clark repeatedly called, texted, and sought out Peterman, pleading for Peterman to change his mind.

174.    By early December 2023, recognizing the increasing professional demands of his role, the growing risks associated with his whistleblowing activities, and the overall impropriety of the situation, Peterman reaffirmed that their relationship must end completely and permanently.

175.    Despite the breakup, Clark's professional standing at Comtech remained unchanged.  She retained her position and continued to serve Peterman and other executives without any reduction in duties, salary, or status.

176.    In the days that followed, Clark's behavior became increasingly volatile. She grew hostile, confrontational, and erratic in her interactions with Peterman and others.

**VI. Clark Learns of Peterman's Whistleblowing Activities**

177.    As Peterman distanced himself from Clark, she became increasingly intrusive. Using her trusted access to his computers and information, she began questioning him about his meetings and activities.

178.    Using her trusted access, Clark discovered that Peterman was a whistleblower and that he was at odds with certain members of the Board, particularly Waldman and Chambers— both of whom had been the subject of a contentious activist effort in 2021 and 2022 that publicly sought to remove them from Comtech's Board.

179.    With respect to Chambers, Clark learned that Peterman had raised fiduciary and governance concerns like those found in a third-party ERISA lawsuit filed against Chambers in the U.S. District Court for the Central District of California in September 2023.

180.    The lawsuit alleged, among other things, that Chambers had breached her fiduciary duties by advising a public pension plan and its Board of Trustees to invest $30 million in participants' retirement savings in a fund.

181.    The lawsuit further alleged that the fund was a hastily formed entity with undisclosed ties to Chambers and that she had abandoned her fiduciary duties by failing to review or monitor the investment program, thereby allowing manipulated, speculative, and baseless methods for valuing different investments.

182.    Clark understood that Chambers had replicated this pattern of fiduciary neglect at Comtech. Clark also knew that Peterman had reported that Chambers should be removed from the Board—or at least the Audit Committee—given the third-party allegations that she had previously supervised financial manipulation and his own belief that the Audit Committee was not functioning properly and was allowing internal controls at Comtech to deteriorate.

183.    With respect to Waldman, Clark learned that in the fall of 2023, Peterman had reported whistleblowing concerns directly to Waldman

184.    Clark learned that Peterman did as well to a third party involved in oversight.

185.    These concerns centered on questionable financial practices, Comtech's failure to maintain proper internal and disclosure controls, and materially inaccurate financial reporting.

186.    Among other things, Peterman raised alarms about CFO Bondi's management of internal controls, which had significantly deteriorated. He also questioned certain accounting practices and Waldman's proper oversight of internal controls under Sarbanes-Oxley.

187.    The Audit Committee, effectively controlled by Chambers and Waldman, was responsible for supervising CFO Bondi.

188.    Clark further learned that, after Comtech filed its SEC Form 10-Q for the first quarter ending October 31, 2023, on December 7, 2023, Peterman escalated his concerns regarding CFO Bondi's handling of the company's accounting and disclosure control weaknesses.

189.    Peterman specifically identified what he believed to be improper revenue recognition practices related to a $20 million order from a reseller of Comtech's troposcatter technologies. He viewed these accounting irregularities as a serious risk of misleading investors and regulators if left uncorrected.

190.    Peterman informed Waldman that he was not comfortable signing off on Comtech's SEC Form 10-Q for the second quarter ending January 31, 2024, in which Waldman and Bondi wanted to recognize the revenue.

191.    Peterman reported these concerns in good faith to Waldman and others, unaware that Waldman and Chambers—both members of the Audit Committee—would ultimately conceal their knowledge of his consensual relationship with Clark and retaliate against him for his whistleblowing.

192.    As Clark became aware of Peterman's whistleblowing, she persistently pressured him for details.

193.    Peterman repeatedly refused to discuss them with Clark, recognizing the sensitive nature of these governance and financial issues.

194.    After the September 27, 2023, incident and through December 2023, Clark attempted to rekindle the full relationship, but Peterman declined.

195.    Around this time, Clark began prying into Comtech's newly announced company-wide expense and travel reductions.

196.    Clark also learned that Comtech had decided to relocate the company corporate headquarters to Arizona, which was completed in March 2024.

197.    Clark repeatedly asked for exceptions to Comtech's travel policies so she could continue accompanying Peterman on trips.

198.    Despite being explicitly told "no" multiple times, Clark continued to pressure him to "make an exception" to the company-wide travel restrictions.

199.    Clark also demanded assurances that she would be relocated to Arizona

200.    Peterman informed her that such a decision would be based on business and staffing needs and that even if she remained in New York, there were significant C-level officers, including CPO Kerr and CFO Bondi, whom she could continue supporting.

201.    Instead of accepting Comtech's new policies and operational changes, Clark became increasingly resentful, disruptive, and combative.

202.    As her behavior shifted, Clark began making an increasing number of errors in emails sent on Peterman's behalf—misquoting statements, providing inaccurate information, and misrepresenting key details.

203.    Peterman, unaware these errors were intentional, instructed Clark to double-check all correspondence and verify information before sending emails.

204.    Instead of complying, Clark ignored directives and continued making errors that undermined Peterman's professional communications.

205.    Clark also began making unprofessional remarks, telling employees, "I work for the CEO, and I can do and spend whatever I want."

206.    When asked by executives for support, she dismissively responded, "I don't work for you—I have the same boss as you."

207.    As Clark's behavior escalated, Peterman reported her conduct to CLO Walther.

208.    CLO Walther was designated by the Board and effectively acted as General Counsel and Comtech's Compliance Officer who interacted with the Audit Committee and the Board and issues related to the SOBC and other matters.

209.    Peterman specifically raised concerns about Clark's insubordination, refusal to follow directives, and aggressive demands for travel exceptions.

210.    CLO Walther confronted Clark about her conduct.

211.    Rather than de-escalating, Clark retaliated. Shortly after being confronted, she began orchestrating a calculated and malicious scheme—creating the Sham Complaint and falsely accusing Peterman of sex crimes and misconduct.

**VII. Clark Creates the Defamatory Sham Complaint and Destroys Peterman's Reputation**

212.    Fueled by vindictiveness and sole malice, Clark set out to create a fabricated legal document—not simply to remove Peterman but to permanently destroy his career, reputation, and livelihood.

213.    Clark deliberately fabricated baseless allegations—not in good faith, but as a calculated act of revenge. Her Sham Complaint was never a case of "he said, she said"; instead, she knowingly and maliciously concocted the outrageous claim that Peterman committed sex crimes against his Second Wife. Aside from her name, nearly every detail was a complete fabrication.

214.    Beginning in September 2023, in knowing and willful violation of New York State and Federal law—including but not limited to the Computer Fraud and Abuse Act (18 U.S.C. § 1030) and Comtech's own policies—Clark systematically accessed, copied, and printed confidential business records, emails, personal correspondence, and financial documents belonging to Peterman and Comtech (collectively, the "Stolen Documents").

215.    Among the Stolen Documents was a highly confidential 360-degree evaluation of Peterman (hereinafter, the "Independent Integrity Evaluation Report"), which was conducted just weeks before Peterman's wrongful termination.

216.    Clark misappropriated and manipulated Independent Integrity Evaluation Report and other Stolen Documents to fabricate a false narrative that would later become her Sham Complaint.

217.    In February 2024, Clark knowingly and fraudulently provided false information to Comtech in violation of New York State law, the FMLA (29 U.S.C. § 2611 et seq.), and Comtech's policies to unlawfully obtain FMLA leave.

218.    Instead of using her FMLA leave for legitimate medical or personal reasons, Clark exploited this time to draft and finalize a Sham Letter and Sham Complaint, carefully constructing them to inflict maximum damage on Peterman and force Comtech's hand to terminate him.

219.    Leveraging her insider access to the Stolen Documents and other confidential Comtech governance and personnel materials, Clark deliberately fabricated allegations of sexual misconduct, harassment, and abuse—all of which she knew were patently false.

## VIII. Clark Authorizes Attorney to Send Peterman a Sham Letter

220.    On or about February 26, 2024, Peterman received, via email, a letter (the "Sham Letter") from an individual claiming to be an attorney retained by Clark "in connection with claims against Comtech and yourself [Peterman]."

221.    The Sham Letter was prominently marked "PERSONAL & CONFIDENTIAL.""

222.    The Sham Letter was sloppily drafted, recklessly prepared, and improperly directed.

223.    It was not a legitimate legal notice.

224.    It was not sent in good faith, was intentionally vague, and failed to articulate any specific legal claim.

225.    The Sham Letter was defamatory both per se and by implication, as it falsely implied unlawful conduct by Peterman, a high-profile CEO of a publicly traded company. The

mere suggestion that Clark had legal claims against Peterman—without specifying any misconduct—immediately placed his integrity and professional reputation into question.

226.    As the CEO of a public company, any allegations of misconduct, particularly those vaguely suggesting legal violations, carried severe consequences, including reputational damage, investor concerns, and public scrutiny.

227.    The letter, despite lacking specific claims, falsely implied that Peterman had engaged in improper or unlawful conduct, thereby defaming him without a direct accusation

228.    It was so poorly prepared that it did not even correctly identify Comtech's legal name.

229.    The Sham Letter was addressed solely to Mr. Peterman, with the words "c/co Comtech Communications Corp," which is not Comtech's legal or DBA name.

230.    The Sham Letter also listed Comtech's former headquarters in Melville, New York, rather than its actual and known headquarters in Arizona. Clark, having insider knowledge, was fully aware of the headquarters relocation and the inaccuracy of this information.

231.    Although the Sham Letter vaguely claimed that Clark had "claims" against Peterman and Comtech, it failed to identify a single specific claim under federal or New York law.

232.    Instead, the Sham Letter ambiguously stated, "Clark reserves the right to bring additional claims, and this list is not exhaustive."

233.    However, the Sham Letter contained no actual claims or any supporting list.

234.    The Sham Letter was a textbook example of defamation by implication, as it falsely suggested wrongdoing while deliberately omitting details—creating an impression that Peterman had engaged in misconduct without making any factual allegations.

235.    This strategic vagueness was designed to cast a shadow of doubt over Peterman's leadership, tarnishing his reputation without offering him a clear accusation to refute.

236.    The Sham Letter was a blatant attempt to extort money from Peterman under the pretense of legal action and was one just one step of a calculated effort to have Peterman terminated for cause.

237.    It imposed an arbitrary one-week deadline for settlement, attempting to coerce and strong-arm a resolution rather than initiate a legitimate legal process.

238.    It threatened: "If I do not hear from you [Peterman], I shall assume you have no interest in an amicable resolution, and we shall proceed accordingly."

239.    The Sham Letter referred to "the lawsuit that we will be filing next week."

240.    Yet no lawsuit was ever filed in the Eastern District Court nor any court.

241.    Clark knew that Comtech was a public company and that any threats or potential claims sent to the company would be widely distributed and investigated.

242.    By addressing the Sham Letter to Peterman at his workplace, Clark and her attorney ensured that Comtech personnel and others would see the letter.

243.    The mere existence and forced distribution of the Sham Letter caused immediate reputational harm.

244.    The defamatory statements and false accusations contained within the Sham Letter spread internally, further exacerbating the damage.

31

245.    Clark knew or was grossly reckless in not knowing the errors and falsehoods in the Sham Letter.

246.    Any attorney who demonstrated such gross carelessness—getting Comtech's legal name wrong and using an outdated corporate address—showed a fundamental lack of legal diligence, raising serious questions about the legitimacy of any claims purportedly being made.

247.    Clark, having personally retained the attorney and directed the false claims, is responsible for both her own actions and those taken on her behalf.

248.    The CLO told Peterman that any claims Clark might have against Comtech were obviously not properly vetted, yet the CLO still proceeded to broadly circulate the Sham Letter to Comtech's Board and other individuals.

249.    On March 4, 2024, the Audit Committee and Board met, hastily acting on Clark's reckless and unvetted Sham Letter. Ignoring its glaring inaccuracies, they treated it as credible, setting in motion the process that led to Peterman's wrongful termination.

**IX. Clark Escalates Her False Allegations with the Sham Complaint**

250.    On or about March 6, 2024, Clark and her attorney published and distributed the Sham Complaint to Peterman and Comtech. The fake legal complaint was labeled "United States District Court – Eastern District."

251.    The Sham Complaint was widely disseminated not only inside Comtech but to third parties, including auditors, PR firms, non-attorney personnel and consultants.

252.    At the time the Sham Complaint was sent, there was no pending litigation, no judicial proceeding, and no legitimate legal process in motion.

253.    Contrary to the Sham Letter's claim that legal action was imminent, the Sham Complaint was never filed in the Eastern District Court or any court.

254.    The Sham Complaint was unsigned, further confirming that it was never intended as a legitimate legal document.

255.    Like the Sham Letter, the Sham Complaint was not properly vetted by Clark's attorney and was recklessly unprepared. However, it contained the most egregious and extreme allegations, including falsely accusing Peterman of committing sex crimes.

256.    Clark never intended for her wholly false and outrageous Sham Complaint to be tested in any court; instead, she weaponized it as a coercive tool, knowing that its mere existence would be enough to create panic and force a response from Comtech.

257.    Clark wanted revenge on Peterman for breaking up with her.

258.    The Sham Complaint was not a complaint seeking due process.

259.    Clark and her attorney did not rely on the merits of any legitimate claim but instead used the mere threat of exposure to coerce Peterman's termination within days. Clark, through her attorney, made an explicit ultimatum: fire him and pay us money, or else.

260.    In a stunning display of corporate cowardice, Comtech capitulated without hesitation, orchestrating Peterman's termination in just four business days from the date of Clark's Sham Complaint.

261.    The speed and severity of Comtech's response underscore that the Sham Complaint was never a good-faith legal claim but a premeditated weapon—designed to eliminate Peterman without scrutiny, challenge, or truth-seeking.

262.    The Sham Complaint falsely named both Peterman and Comtech as defendants and advanced an entirely fabricated narrative—falsely alleging that Peterman "groomed" Clark and coerced her into a secret relationship by "implicitly" conditioning her continued employment and career advancement on engaging in repeated sex acts during company-sponsored trips.

33

263.    Knowing she had no actual evidence to support her claims, Clark deliberately relied on the word "implicitly" to manufacture the illusion of wrongdoing where none existed.

264.    Clark was fully aware that neither Peterman nor Comtech had ever engaged in any conduct that could remotely constitute quid pro quo harassment.

265.    Clark personally knew she had no emails, no voice recordings, no texts, and no documented instances of coercion throughout their brief relationship.

266.    Clark's reliance on vague and suggestive language was a calculated strategy—a desperate attempt to manufacture misconduct in the Sham Complaint using inference and insinuation rather than fact.

267.    But Clark knew that a vague and unsubstantiated claim of "implicit" harassment alone would not be enough to destroy Peterman's career and trigger his termination.

268.    To push Comtech's Board into action, Clark escalated her lies to shock the conscience and create an irreparable scandal.

269.    Clark, fully aware that no legitimate evidence existed to support her claims, deliberately manufactured a grotesque and sensationalized narrative—one so extreme, inflammatory, and beyond the realm of plausibility that it would override reason, manipulate emotions, and force Comtech's Board into a panicked and immediate response.

270.    Clark knew that falsely accusing Peterman of horrific and violent sex crimes would create a scandal so explosive that he would suffer catastrophic personal and professional ruin.

271.    Clark weaponized the Sham Complaint, calculating that the sheer depravity of her claims would eliminate scrutiny of her own misconduct, obliterate Peterman's career, and pressure Comtech into immediate action against him.

272.    Clark, acting with sole malice, fabricated a series of grotesque, malicious, and defamatory allegations—each more outrageous than the last.

273.    Clark then deliberately crafted her Sham Complaint to contain the most egregious and extreme accusations imaginable.

274.    The false statements she published with actual malice included, but were not limited to:

- Peterman sexually harassed, sexually assaulted, sexually trafficked and discriminated against Plaintiff [Ashley Clark].”

- “Peterman kissed her [Ashley Clark] on the lips without her consent.”

- “Plaintiff [Clark] was forced to perform oral sex on Mr. Peterman.”

- “Mr. Peterman sexually assaulted Plaintiff without her consent.”

- “Plaintiff [Clark] was forced to engage in unwanted sexual intercourse.”

- “Plaintiff [Clark] was forced to engage in unwanted sex with Mr. Peterman.”

- “Peterman began to sexually assault Plaintiff [Clark].”

- “Peterman had previously engaged in sexual harassment with another subordinate employee—his second wife.”

275.    Clark’s Sham Complaint also falsely alleged that Peterman “directed her” to complete his New York Sexual Harassment Course Prevention for Supervisors & Managers, which was due on December 31, 2023.

276.    Clark, who had regularly used Peterman’s user ID and passwords, took the course herself on December 28, 2023, without Peterman’s knowledge, and later fabricated this claim to support her false narrative.

277.    Clark improperly accessed and stole a copy of the Independent Integrity Evaluation and read the details of such report.  This report was dated just weeks before Clark's Sham report. Clark was not authorized to read this report by either the Board or Peterman as it was a highly confidential report prepared on behalf of the Board and Peterman that reflected an independent assessment of Peterman.

278.    This Independent Integrity Evaluation Report—which was based on interviews with seven senior operational executives and two Board members—concluded that Peterman was "incredibly transparent with the Board" and that his "integrity is beyond question."

279.    Clark deliberately and maliciously distorted its methodology, falsely alleging that her simple exclusion from it was evidence that Peterman discriminated against her.

280.    Clark's Sham Complaint made it clear that its sole purpose was to force Peterman's immediate termination. She falsely asserted, "This type of behavior and lack of compliance from the CEO and Chairman of the Board of a publicly traded company is simply unacceptable." Clark deliberately framed her complaint not as an avenue for investigation or due process, but as an ultimatum to Comtech: terminate Peterman for cause or else.

281.    Clark knew that Comtech, as a publicly traded company, would be forced to take immediate action in response to the allegations, regardless of their truth.

282.    Clark weaponized this knowledge to manipulate Comtech's response, ensuring that Peterman's removal would be swift and irreversible.

283.    Clark never intended for the allegations in her Sham Complaint to be subjected to any real scrutiny. She deliberately avoided legal processes that would have required her to substantiate her claims and instead sought immediate, unchallenged action.

284.    Despite demanding Peterman's termination, Clark refused to engage with Comtech in any meaningful way following the Sham Complaint. Based on information available to Peterman, Clark has never met with Comtech through at least October 31, 2024, further confirming that she had no genuine interest in justice or accountability—only in ensuring Peterman's destruction.

285.    Clark's refusal to participate in any investigatory process or provide sworn testimony under the penalties of perjury further confirms that her allegations were knowingly false.

286.    Had she been truthful, Clark would have had every reason to cooperate with Comtech's inquiries. Instead, she strategically avoided scrutiny, ensuring that the allegations would remain untested while still achieving her desired result: Peterman's termination.

287.    Clark never reported her false allegations to any law enforcement or government agency before publishing her Sham Complaint.

288.    Despite claiming Peterman physically harmed her, she never sought medical attention or filed a restraining order.

289.    Clark did not report her allegations to the NYDOL, the EEOC, law enforcement, or any government agency before publishing her Sham Complaint.

290.    Clark never called 911 or filed a police report in any of the cities where she falsely claimed Peterman had sexually assaulted her—including Chandler, Arizona; Washington, D.C.; Colorado Springs, Colorado; Jersey City, New Jersey; Greenwich, Connecticut; Middleburg, Virginia; and London, United Kingdom.

291.    She did not do so because she knew the Sham Complaint was entirely fabricated.

292.    Instead, Clark deliberately bypassed legitimate channel knowing she would cause Peterman reputational harm and trigger an immediate public response by Comtech.

293.    With knowledge that her allegations were false and with reckless disregard for their truth or falsity, Clark ensured the Sham Complaint would be distributed and read by every single member of the Board—the only individuals with the authority to terminate Peterman.

294.    As an insider, Clark knew that the Board would use her demands and Sham Complaint as a pretext to terminate Peterman.

295.    Because she knew her claims were completely fabricated, Clark refused to meet with an investigator hired by the Audit Committee.

296.    Clark issued an ultimatum to Comtech: terminate Peterman immediately.

297.    Clark's demand was not a request for an investigation, a hearing, or due process—it was a demand for immediate execution.

## X. Clark and the Board Knew She Wasn't a Victim of Quid Pro Quo Sexual Harassment

298.    Prior to sending the Sham Letter and Sham Complaint, Clark's attorney failed to conduct any reasonable investigation into the facts or law necessary to ensure the validity of Clark's claims.

299.    Clark was never a victim of sex crimes or quid pro quo sexual harassment, yet she deliberately manufactured allegations falsely implying otherwise.

300.    Even in Clark's Sham Complaint, she failed to allege any specific quid pro quo statements made by Peterman or anyone at Comtech. Her inability to point to a single instance of coercion underscores the reckless and baseless nature of her claims.

301.    Given the Board's direct involvement in Comtech's operations, oversight of executive roles, and regular engagement with Clark, it was fully aware that she had never been subjected to quid pro quo sexual harassment.

302.    Clark knew the Board would act on these allegations despite even though they knew or should have known they were false because of its willingness to use Clark's fabrications as a pretext for Peterman's termination.

303.    Sexual harassment is a serious and pervasive issue in the workplace, but under Peterman's leadership at Comtech, it was not tolerated.

304.    Notably, Comtech's leadership team included multiple female executives—its COO, CSO, and CPO—each of whom Peterman actively supported, including by encouraging their participation in leadership programs designed to advance women in corporate leadership..

305.    Clark was never subjected to quid pro quo sexual harassment at Comtech, nor was she ever placed in a position where her professional opportunities were conditioned upon compliance with any improper requests.

306.    At no time was Clark offered a promotion, salary increase, bonus, or any other employment benefit in exchange for engaging in a personal relationship.

307.    No employment-related decisions regarding Clark—whether related to promotions, raises, assignments, or job security—were ever based on her agreement or refusal to engage in a relationship with Peterman.

308.    Clark was never intimidated, coerced, or pressured into providing sexual advances, nor was she subjected to threats, ultimatums, or retaliatory action for rejecting or ending her relationship with Peterman.

309.    Clark's job responsibilities, compensation, and career trajectory were determined in accordance with corporate policy and based on recommendations and approvals from C-level executives, including CFO Bondi, CPO Kerr, and CLO Walther.

310.    In March 2023, Comtech sponsored Clark's membership in "Chief," an elite business organization for senior executive women, providing her with access to mentoring, executive coaching, and a personal board of advisors. This demonstrates that Clark's professional development was independent of Peterman and was not contingent on any personal relationship.

311.    Clark had unrestricted access to C-level executives and the Board, and she knew that no employment decisions—whether regarding promotions, compensation, or retention— were ever contingent upon engaging in or rejecting a relationship with Peterman or any other executive.

312.    Clark held no special influence or authority over Comtech's business decisions, nor was she granted any privileges or undue favoritism as a result of her role as Chief of Staff.

313.    At all times, Clark's employment remained secure through independent company governance policies.

314.    At all times, no single executive, including Peterman, had unilateral control over her career.

315.    At no point before, during, or after their relationship did a quid pro quo dynamic exist between Peterman and Clark.

316.    Peterman never used his authority to pressure Clark into any relationship or professional exchange.

317.    Rather than being coerced, it was Clark who actively pursued the relationship, and Peterman who ultimately ended it.

318.    Clark knew that her allegations of quid pro quo harassment were false, yet she deliberately manufactured them, knowing they would have an immediate and damaging impact on Peterman's reputation and career.

319.    Given her direct and unfiltered access to the Board and C-level executives, Clark knew that no quid pro quo harassment had ever taken place.

320.    Nevertheless, Clark proceeded with false allegations in reckless disregard for the truth, with the intent of ensuring Peterman's removal from Comtech.

321.    Clark intentionally manipulated Comtech's internal reporting mechanisms, with the calculated intent of triggering a rapid response from the Board. She knew that the Board, already predisposed to removing Peterman for unrelated reasons, would seize upon her accusations as a convenient pretext to justify his termination.

## XI. Clark's False Allegations Directly Trigger Comtech's Pretextual Investigation

322.    Clark initiated Comtech's process by knowingly fabricating claims. Using her inside knowledge, she deliberately and maliciously created falsehoods that she knew would lead to an internal investigation designed to immediately damage Peterman's career.

323.    Clark's actions were calculated not only to defame Peterman but interfere with his contractual rights, causing severe financial harm and intentionally inflicting emotional distress.

324.    Clark knowingly included false allegations of criminal sex acts and other illegal conduct in her Sham Complaint, fully aware that this would compel the Board to launch an investigation. She exploited this obligation, calculating that the mere existence of such claims—regardless of their truth—would force the Board into immediate action..

325.     As Lead Independent Director, Waldman swiftly took control of the investigation and directed it to the Audit Committee.

326.     This decision to assign the investigation to the Audit Committee was intentional, as Waldman was the Chair of the Audit Committee, which included Board members Chambers, Lord, Crawford, and Carpenter.

327.     Despite their personal involvement in the matter due to their knowledge and approval of the relationship, Waldman and Chambers refused to recuse themselves, thereby ensuring that the investigation would be neither independent nor unbiased.

328.     Waldman then designed an investigation to comply with Clark's immediate demands to terminate Peterman while also benefiting from discrediting his whistleblowing allegations.

329.     Waldman knew that Peterman's whistleblowing posed a direct threat to his financial interests and Board position.

330.     Waldman's own compensation had recently increased from $217,753 to $310,808—a 43% raise. Further scrutiny by Peterman into his accounting, internal controls, or governance failures would jeopardize Waldman's influence and financial benefits.

331.     Motivated solely by ill-will and self-preservation, Waldman acted swiftly to eliminate Peterman before Clark went public or Peterman's whistleblowing could lead to Board instability or external regulatory action.

332.     Regardless of the outrageous and knowingly false sex crime allegations, Clark, Waldman, and Chambers personally knew that Clark's claim that the relationship was clandestine was false.

333.    However, Clark understood that Waldman and Chambers controlled the Audit Committee and that they could manipulate the Board into accepting her allegations as fact.

334.    Clark also knew that even if she failed to have Peterman terminated, Comtech would likely offer her financial compensation in response to her false claims.

335.    Clark knew that both Waldman and Chambers had been targeted by an activist investor several years earlier and that they were likely to offer financial compensation to avoid further controversy.

336.    Clark understood that by pressing false allegations, she would exert leverage over them and ultimately secure a monetary settlement.

337.    Board members Lord and Crawford were relatively new, having joined in June 2023—months after Waldman and Chambers had personally approved Peterman's potential relationship with Clark.

338.    Waldman and Chambers deliberately concealed from Lord and Crawford that they had already approved the relationship, misleading them into believing it was undisclosed or improper.

339.    Additionally, Waldman and Chambers knew that Carpenter had personally experienced a failed marriage due to infidelity and would react emotionally if led to believe that Peterman engaged in an extramarital affair, whether disclosed or not—making her an easy target for manipulation.

340.    By deliberately withholding critical facts and lying to other Board members, Clark, Waldman, and Chambers crafted a false narrative, leading the Audit Committee to view the relationship as undisclosed and inappropriate rather than what it truly was—an approved, fully consensual relationship that violated no policies.

341.     This deliberate deception ensured that the Board's ultimate decision was not based on facts but on a premeditated scheme to remove Peterman under the false pretext of ethical and policy violations.

342.     Clark, Waldman and Chambers' intentional decision to disregard the truth was not just aimed at terminating Peterman—it was specifically designed to terminate him For Cause, as defined in Peterman's Employment Agreement.

343.     By terminating Peterman For Cause, Comtech sought to avoid paying severance while simultaneously undermining his credibility with regulators should his whistleblowing become public. For Clark, a For Cause termination ensured she would either receive a settlement payment or that Peterman's credibility would be destroyed, making it easier for her to pursue separate financial compensation.

344.     To create a veneer of legitimacy, on March 6, 2024—the same date as the unsigned Sham Complaint—the Audit Committee retained a workplace investigator.

345.     Rather than a good faith attempt to verify Clark's claims, the investigation was a pretext to justify Peterman's termination while shielding the Board from scrutiny. Clark knowingly provided false statements, fully aware that they would be used as the foundation for a biased investigation and predetermined termination.

346.     As Peterman learned of the Audit Committee's investigation—triggered solely by Clark's false allegations—he experienced severe distress, shock, and emotional trauma.

347.     Clark's intentional fabrication of extreme and defamatory accusations left Peterman bewildered, betrayed, and struggling to comprehend how someone he once trusted could manufacture such lies with reckless disregard for the truth, knowing they would be weaponized against him.

348.    Peterman suffered from severe sleep deprivation in the days leading up to his investigative interview, unable to process why Clark would fabricate allegations of sex crimes against him.

349.    Despite this, Peterman, knowing he had done nothing wrong, agreed to fully participate in the interview with the investigator.

350.    On March 11, 2024, Peterman spoke virtually with the workplace investigator.

351.    Peterman participated in good faith, even as he grappled with extreme stress and emotional exhaustion caused by Clark's extortion attempt.

352.    Peterman was not provided with any questions in advance, nor was he given a reasonable opportunity to prepare a full response or follow-up.

353.    Both Peterman and his attorneys repeatedly reminded the investigator that Peterman did not have access to his notes, calendars, or other records—critical materials for accurately recalling key details.

354.    Comtech's refusal to provide Peterman with access to these materials for the interview was deliberate, and Clark strategically exploited this procedural disadvantage.

355.    Clark knew that Comtech's investigative process typically denied employees access to relevant documents, allowing her fabricated statements to go unchallenged. The inability of Peterman to present full documentation worked to her advantage, as she relied on fabricated statements that could not be immediately disproven.

356.    Clark was pressing the Board for Peterman's immediate termination and knew that Peterman extensively relied upon his notes.

357.    When asked, Peterman truthfully stated that his relationship with Clark was entirely consensual.

358.    Peterman categorically denied every fabricated sex crime allegation, explicitly rejecting any claim that he had ever engaged in harassment, coercion, or retaliation.

359.    The investigator asked about Clark's false allegation that Peterman "directed her" to complete an online New York Sexual Harassment Prevention Course for Supervisors & Managers, which she took on his behalf without authorization on December 28, 2023.

360.    Peterman truthfully stated that he did not or had no specific recollection of directing Clark to take such a course but acknowledged that he later became aware that she had completed it.

361.    Peterman recalls and believes that Clark, acting on her own initiative, completed the necessary training and completion forms as a favor to CPO Kerr who had previously requested Clark ensure Peterman complete the course before December 31, 2023.

362.    In hindsight, Clark, using her trusted access to Peterman's User ID and passwords, either filled out what she believed to be an insignificant training form for an executive on travel, or did so with the sole motive of setting up Peterman and falsely claiming that he directed her to take the course.

363.    While Peterman recognizes the importance of completing all required courses, he acknowledges that he did not revisit this specific training course due to his extensive travel schedule and his focus on finalizing the $45 million investment from White Hat, which was announced in January 2024 and the upcoming earnings call scheduled for early March.

364.    Upon discovering the situation at the time, Peterman recalled that he had already expressed concerns about Clark's behavior to CLO Walther.

365.    At the time, Peterman chose not to escalate the matter, perceiving Clark's actions as an attempt to assist CPO Kerr, who had specifically requested that Clark ensure that the training be completed by December 31, 2023

366.    Peterman himself took at least four other similar training and policy just days earlier on December 26, 2023, all covering similar or the exact compliance topics. Those four courses included:

- Comtech's Anti-Harassment New York State Policy

- Comtech's Anti-Harassment Supplemental course for Managers

- Comtech's SOBC training and acknowledgment

- Comtech's Cybersecurity Training.

367.    The SOBC training itself included sixty-one detailed questions many of them covering the exact same topics as the New York Sexual Harassment Course Prevention for Supervisors & Managers course and which included specific training required by New York State Law including:

- Question 30 – which specifically dealt with Quid Pro Harassment between a male supervisor who promised a female subordinate a promotion if she would go out to dinner with him.

- Question 31 – which specially dealt with a supervisor who would put in a "good word" if sexual favors were performed."

- Question 32 – which specifically alleged what employees should do if a member of senior management routinely touched someone in an unprofessional and inappropriate manner.

368.    Peterman passed the training and received a certificate of completion stating such.

369.    As the interview progressed, the nature of the interview only deepened Peterman's sense of betrayal and disbelief.

370.    Peterman's interview with the investigator lasted approximately one hour.

371.    The investigation was the direct result of Clark's Sham Letter and Sham Complaint, designed to facilitate a predetermined outcome—Peterman's immediate termination. Clark knew this would be the result when she made her knowingly false allegations.

372.    After the interview, Comtech's General Counsel assured Peterman that he had "nothing to worry about," telling him that there was "no evidence of any wrongdoing" and that the matter would "all blow over."

373.    Clark's scheme worked exactly as intended. She manipulated the Board into weaponizing her false allegations, ensuring Peterman's immediate termination and irreparable reputational damage.

374.    Clark's malicious and knowingly false allegations were the direct and proximate cause of the investigation and wrongful termination that followed.

375.    Had Clark not fabricated her claims, there would have been no basis for an investigation, let alone a termination. Her intentional misconduct directly caused Peterman's financial and reputational harm.

## XI. Peterman's Wrongful Termination

376.    Within twenty-four hours of Peterman's interview, he was wrongfully terminated "For Cause" as defined in his Employment Agreement.

377.    After Peterman's interview, the Audit Committee met, and Waldman and Chambers immediately pushed for Peterman's termination.

378.    Carpenter vocally supported the decision.

379.    Shamash remained largely silent but signaled his agreement with Waldman.

380.    Lord and Crawford appeared reserved and visibly stunned by the developments.

381.    Just two hours later—at 4:13 PM—after learning that the Audit Committee had reached a consensus to recommend Peterman's immediate termination, Lord abruptly resigned.

382.    Director Lord, who was on the Audit Committee, wanted no part in the wrongful termination of Peterman.

383.    Following Lord's resignation, the remaining Audit Committee members reconvened and formally resolved to recommend that Peterman be terminated.

384.    During these discussions, Waldman proposed multiple strategies for terminating Peterman.

385.    Waldman insisted that Peterman be terminated "For Cause" under his Employment Agreement, ensuring that Comtech could withhold millions of dollars in contractual compensation owed to Peterman.

386.    On March 12, 2024, the Board convened a formal meeting to terminate Peterman "For Cause" and appoint Quinlan as its new Chairman.

387.    With reckless disregard for the truth, Waldman directed Sidley Austin LLP to "pad the file" with anything that could be used to strengthen a case for termination "For Cause."

388.    This directive, issued with clear malice, was intended to fabricate, exaggerate, and distort claims against Peterman in a deliberate attempt to destroy his reputation.

389.    Clark's demands and false accusations were the direct and proximate cause of the Board's decision to terminate Peterman.

390.    Clark, fully aware of the Board's inner workings weaponized her demands and Sham Complaint to ensure the Board would take swift action against Peterman.

391.    On March 12, 2024—just three business days after the date on Clark's unsigned Sham Complaint—Peterman was summarily terminated via a brief phone call at approximately 6:30 PM, with Board members Waldman and Quinlan delivering the news.

392.    Peterman's termination occurred just one day after his interview.

393.    The Board complied with Clark's demands without hesitation, displaying an astonishing level of capitulation and violating its own fiduciary duties.

394.    During the call, Peterman was informed that he was officially terminated "For Cause" under the terms of his Employment Agreement.

395.    The decision was made with reckless disregard for the truth.

396.    Peterman was never given a second interview, nor was he provided any opportunity to review or respond to any findings before his termination.

397.    By falsely invoking a "For Cause" termination, the Board deprived Peterman of all financial benefits owed under his Employment Agreement, resulting in at least $6 million in direct economic damage and triggering millions more in lost future opportunities.

398.    After his termination, Peterman was left in a state of profound shock and distress.

399.    The suddenness and severity of the decision overwhelmed him.  Peterman's ability to think rationally was severely impaired. He struggled to comprehend how Clark's entirely fabricated Sham Complaint could have led to this decision.

400.    The emotional turmoil was so intense that Peterman found himself in a state of disbelief, confusion, and psychological devastation.

401.    Peterman questioned the very reality of the situation.

402.    Because Clark's actions were the direct and proximate cause of his termination and intentionally or negligently inflicted emotional distress, Clark is responsible for the severe emotional and financial harm Peterman suffered.

## XII. The False Termination Letter

403.    Shortly before midnight on March 12, 2024, Peterman received a termination letter (the "Termination Letter") falsely stating that the Board had decided to terminate him "For Cause."

404.    The Termination Letter was sent to Peterman's counsel and via FedEx to his home address at 333 W I Street, Encinitas, California.

405.    The Termination Letter was signed by Board member Quinlan, a founder and managing director of White Hat.

406.    The Termination Letter set forth three false reasons for Peterman's "For Cause" termination.

407.    The first false reason claimed that Peterman had acknowledged being in a sexual relationship with a subordinate employee for several months and had failed to disclose the relationship to the Company or the Board.

408.    The second false reason alleged that Peterman had "omitted any mention of this undisclosed sexual relationship" in responses to a Directors and Officers Questionnaire that he signed on October 12, 2023.

409.    The third false reason falsely accused Peterman of directing Clark to take the New York State Harassment Prevention Course, falsely claiming that this resulted in falsified company records.

410.    Each of these allegations was demonstrably false, contrived, and exaggerated. Even if they had been true, they did not rise to the level of a "For Cause" termination under Peterman's Employment Agreement.

411.    The Board acted solely with malice and ill intent, seeking to humiliate Peterman and deprive him of the severance and compensation he was contractually owed.

412.    The Termination Letter explicitly stated that the Board would not honor a provision in Peterman's Employment Agreement granting him a ten-business-day period to cure any alleged "For Cause" conduct. By refusing to honor this contractual right, Comtech knowingly and willfully breached Peterman's Employment Agreement.

413.    The Board also failed to exercise another contractual option available to it under the Employment Agreement—placing Peterman on leave while conducting a thorough investigation into Clark's claims. The Board deliberately avoided this approach because it was not interested in determining the truth. It was solely focused on retaliation.

## XIII. The Defamatory Press Release

414.    As her demands were being met, Clark knew that Comtech would voluntarily issue a press release, ensuring that her false allegations would receive immediate and widespread public attention.

415.    Clark understood that Comtech's press releases were instantly distributed through Business Wire, a global media syndication platform that ensured widespread exposure. She knew that once released, these announcements would be automatically picked up by major financial, defense, and telecommunications publications, reaching industry leaders, investors, and the broader public within seconds.

416.    Clark knew or was grossly reckless in not knowing that Comtech's defamatory press release (the "Voluntary Press Release") would trigger immediate and widespread media coverage, particularly in Manhattan, New York—a global financial hub where Peterman had spent decades building his career, reputation, and industry influence.

417.    Acting directly on Clark's knowingly false allegations, Comtech recklessly disregarded the truth and issued the Voluntary Press Release on March 13, 2024, at 9:00 AM, fully aware of the foreseeable and catastrophic harm to Peterman.

418.    To maximize the damage, Comtech—at the direction of Board Member Quinlan—retained Sinter, a marketing firm with direct financial ties to White Hat, to strategically push the false narrative contained in the Voluntary Press Release.

419.    Sinter, acting as an agent for Comtech and White Hat, aggressively pushed the defamatory statements to investors and others.

420.    Known for shaping narratives to boost shareholder value, Sinter crafts investor relation stories and messages—often misleading—to serve the agenda of White Hat.

421.    In this case, Sinter would repeatedly republish false claims and slander Peterman directly, amplifying the damage.

422.    Sinter was an undisclosed related party in Comtech's SEC filings It conducts significant business for White Hat and prominently lists both White Hat and Comtech as clients on its official website at www.sintercompany.com.

423.    The Voluntary Press Release was knowingly false and defamatory—both defamatory per se and defamatory by implication—because it deliberately and falsely suggested criminal, ethical, and professional misconduct by Peterman while withholding exculpatory facts.

424.    The press release contained two false and misleading statements, carefully crafted to destroy Peterman's reputation:

- **Defamatory Statement One:**

    "Mr. Peterman's termination was for conduct unrelated to Comtech's business strategy, financial results, or previously filed financial statements."

- **Defamatory Statement Two:**

    "The Board is committed to upholding the highest standards of ethical and professional conduct." (attributed to Board Member and White Hat principal Mark Quinlan, who was immediately installed as Peterman's successor as Chairman).

425.    These false and misleading statements were deliberately framed to suggest that Peterman was terminated for serious criminal, professional, or ethical misconduct, without explicitly stating any facts—a textbook case of defamation by implication.

426.    The Voluntary Press Release falsely omitted the true reason for Peterman's termination—his whistleblowing activities—which Comtech later disclosed in a Form 10-Q filed with the SEC in January 2025.

427.    Comtech's intentional omission of key facts furthered the defamatory inference. Had Comtech merely stated that Peterman was terminated no such inference by reasonable readers would have been drawn.

428.    Comtech knew that disclosing the truth would contradict Clark's false narrative and expose its retaliatory motives, which is why it chose to omit the real reason for Peterman's termination and instead omitted facts and fabricated a false and defamatory justification.

429.    The Board issued the Voluntary Press Release solely to shift blame and to comply with Clark's explicit demand that Peterman be terminated immediately "for cause"—or else she would go public.

430.    There was no legal obligation for Comtech to issue a press release.

431.    The only legally required action was the filing of an SEC Form 8-K within four business days of the termination event.

432.    Comtech's only legal obligation was to file a Form 8-K with the SEC within four business days of the termination event.

433.    Comtech had no legal requirement to make public statements, quotes, or allegations regarding Peterman's termination. It could have simply stated in the Form 8-K that "Peterman was terminated for cause," without engaging in malicious and defamatory spin.

434.    It could have disclosed Peterman's whistleblowing activities.

435.    It could have even disclosed the Termination Letter so that reasonable investors would be able to make their own assessment of why the Board chose to terminate Peterman.

436.    Instead, Comtech, knowing the truth, voluntarily and maliciously chose to defame Peterman publicly.

437.    Comtech ultimately filed a Form 8-K after issuing the Voluntary Press Release which by then, was widely disseminated.

438.    Because it chose to issue a voluntary press release, Comtech has no privilege.

439.    Clark knew that her allegations were false but took no steps to prevent, correct, or mitigate the damage caused by the Defamatory Press Release.

440.    Clark knew or was grossly reckless in not knowing that Comtech's press release would be republished globally by financial news outlets, defense industry trade publications, and mainstream media—spreading her false allegations to millions.

441.    Clark knowingly allowed the Defamatory Press Release to ignite a chain reaction of media coverage, ensuring that her false allegations dominated the public discourse and irreparably destroyed Peterman's professional standing.

442.    Within seconds, Business Wire disseminated the press release, and multiple high-profile financial and defense industry publications immediately republished Comtech's defamatory statements, amplifying the false narrative against Peterman.

443.    The Defamatory Press Release directly caused widespread media coverage and irreparable harm to Peterman's reputation, career, and personal life. The following articles, but not limited to the them, directly resulted from Comtech's false and misleading press release:

- ***Via Satellite (March 13, 2024)*** published: "Comtech Fires CEO Ken Peterman." The article quoted Comtech's defamatory statements, including Quinlan's assertion that "The Board is committed to maintaining the highest standards of ethical and professional conduct." The article characterized Peterman's termination as "sudden,"

- ***Patch, (March 18, 2024)*** published: "Comtech Dismisses Its CEO Amidst Ethical Concerns," citing Comtech's false statements that the Board was "committed to maintaining the highest standards of ethical and professional conduct."

- ***CEO World Magazine (March 18, 2024)*** published: "Comtech Dismisses Its CEO Amidst Ethical Concerns," citing Comtech's false statements that the Board was "committed to maintaining the highest standards of ethical and professional conduct."

- ***Insider Towers (March 22, 2024)*** published: "Comtech Appoints Interim Manager Following Firing of Former CEO." This article repeated Quinlan's defamatory assertion that "The Board is committed to upholding the highest standards of ethical and professional conduct."

444.    Hundreds, if not thousands, of websites, financial news platforms, and industry publications instantly republished the Voluntary Press Release, ensuring its false allegations spread worldwide. Major business outlets, defense industry media, and investor-focused platforms picked up the story, amplifying the damage.

445.    The rapid and widespread dissemination cemented the false narrative.

446.    The impact of these defamatory statements was long-lasting. On December 16, 2024, Via Satellite republished its March 2024 article in its year-end feature, "Via Satellite's Top Stories of 2024," once again labeling Peterman's firing as a "surprise."

447.    Clark's false allegations directly caused this widespread defamation, professional humiliation, and reputational destruction, making her legally responsible for the resulting harm.

448.    Clark's failure to act was intentional—she knowingly allowed her falsehoods to be widely republished, fully aware of their devastating impact on Peterman's career and personal life.

449.    Since March 2024, Peterman has been unable to secure employment in the satellite and defense industries, resulting in at least $3 million in lost income.

450.    Peterman has and continues to undergo therapy to address the severe emotional distress caused by Clark's actions.

### .XIV. The Reckless Disregard for Truth and Breach of Fiduciary Duty

451.    Acting with sole malice, ill-spite, and reckless disregard for the truth, Clark deliberately set in motion a scheme that not only destroyed Peterman's career but also caused Comtech's Board to violate its fiduciary duties to shareholders, executive officers, and Peterman himself.

452.    Clark knew she was not the victim of quid pro quo harassment, knew that Peterman never committed sex crimes, and yet fabricated the extreme, outrageous, and defamatory claims.

453.    To intentionally inflect emotional distress on Peterman, she also falsely claimed that Peterman committed sex crimes against his Second Wife.

454.    Comtech either knew or recklessly disregarded the falsity of all of Clark's claims.

455.    Based on information obtained by Peterman from the U.S. Department of Justice, Clark never met with Comtech's investigator, refused to cooperate with the investigation.

456.    At least through October 31, 2024, Clark has never sat for an interview or sworn deposition.

457.    Clark knew that if she did, and was truthful, she would have to admit that her Sham Complaint was entirely fabricated and that she had knowingly and willfully violated New York State and Federal law—including but not limited to the Computer Fraud and Abuse Act (18 U.S.C. § 1030), the FMLA, and Comtech's own policies.

458.    Knowing the Board would rush to judgment and accede to her demand to terminate Peterman "for cause," Clark weaponized her allegations with sole malice and reckless disregard for the truth, ensuring the Board would violate its fiduciary duties rather than act in the best interests of shareholders.

459.    In its rush to appease Clark and avoid public scrutiny, the Board ignored that Peterman was in the process of executing a strategic plan that included the sale of Comtech's 911 public safety segment and/or the entire company, as well as the refinancing of all of Comtech's third-party debt.

460.    This strategic plan would have resulted in shareholders receiving at least $10.00 in value per share, compared to the current stock price of approximately $2.00 per share.

461.    The Board's wrongful termination of Peterman, coupled with the false and defamatory Voluntary Press Release, derailed the refinancing process, caused shareholder value to plummet, and left the company struggling in almost every financial and operational category.

462.    In a misguided attempt to avoid lawsuits and easy scrutiny of their failings, Comtech's Board refused to document its decision and findings. Peterman has learned from the U.S. Department of Justice that, as of both the date of his termination and at least through October 31, 2024, Sidley Austin LLP, the law firm retained by the Audit Committee and/or Board to investigate Clark's Sham Complaint, never issued a written report.

463.    Clark deliberately timed the delivery of her Sham Complaint and her demand for Peterman's immediate termination to inflict maximum reputational harm and to pressure the Board into taking immediate action without investigation.

464.    Clark was acutely aware, based on internal emails, board presentations, and other confidential documents she accessed as Chief of Staff, that Comtech's Board was terrified of

shareholder activism and that directors Waldman, Chambers, Shamash, Carpenter, and Quinlan would do almost anything to keep their positions.

465.    Clark read Comtech's SEC filings and saw that the company had spent over $11.2 million in 2022 alone defending itself against activist shareholders, and over $10 million in additional proxy solicitation costs in recent years.

466.    Knowing that certain Board members feared shareholder activism more than anything, Clark manipulated them into using her false allegations as a pretext to remove Peterman, fully aware that they would prioritize self-preservation over fiduciary responsibility.

467.    Clark knew the Board would not conduct an independent or unbiased investigation.

468.    Clark knew the Board would rush to judgment, disregard evidence, fail to interview key witnesses, and conceal exculpatory information contradicting her allegations.

469.    The Board's failure to conduct a proper investigation before terminating Peterman was a gross breach of its fiduciary duties to Comtech shareholders.

470.    Clark knew or should have known that the Board would ignore exculpatory evidence, including Peterman's recent U.S. Department of Defense polygraph examination, which confirmed that he was not vulnerable to blackmail and had no undisclosed relationships.

471.    This polygraph was taken in February 2024, and its results were available to both Clark and Comtech before it terminated Peterman.

472.    This polygraph, required for Peterman's Top Secret/SCI security clearance, was administered by federal examiners and specifically designed to detect ethical lapses and dishonesty.

473.    Clark knew or should have known that Comtech, as a defense contractor, had access to these polygraph results and that no reasonable director would believe Peterman failed to disclose his relationship given his passing results.

474.    While polygraphs are generally not used in civil litigation, they are fully relied upon by the U.S. Department of Defense and every major defense contractor in the United States.

475.    Polygraphs have also been relied upon by Comtech for many years, that is, until the Board wanted to wrongfully terminate Peterman.

476.    Peterman had previously disclosed his lifestyle to multiple Board members and had received explicit approval from Chambers and Waldman. Several executives were aware of his lifestyle. These facts enabled him to pass his polygraph with "No Deception Indicated."

477.    Peterman's polygraph results directly contradicted Clark's and the Board's false narrative that his relationship with Clark had been hidden or clandestine.

478.    Clark knew the Board would fail to interview key executives who had direct knowledge of Peterman's conduct, Clark's behavior, and Comtech's workplace policies.

479.    The Board's investigator never met with Comtech's two most senior female executives, CSO Robinson and COO Hedden, both of whom had worked closely with Peterman and Clark during the period in question. The investigator also failed to interview CTO Chakraborty and CDO Ratigan—individuals who could have directly refuted Clark's false allegations.

480.    Only after Peterman was terminated did the investigator interview Peterman's Second Wife. This interview confirmed that Clark's allegations that Peterman had committed sex crimes against his Second Wife were completely fabricated.

481.    The investigator learned that Peterman's Second Wife described him as a caring, thoughtful, and ethical person, with no history of any type of abusive behavior.

482.    The Board's reckless failure to investigate, ask basic questions, or give Peterman an opportunity to explain himself constituted a flagrant violation of its fiduciary duties.

483.    A clear example of this failure is the Termination Letter signed by Quinlan, which falsely claimed that Peterman "omitted any mention of this undisclosed sexual relationship" in his Directors and Officers Questionnaire signed on October 12, 2023.

484.    In reality, Peterman was fully transparent—he had listed his residential address as the same Arizona address that Clark used when she stayed in Arizona.

485.    Peterman had used this address for over a year while searching for permanent housing in Arizona. He even used it on his Arizona driver's license. Clark's mother routinely ensured that Peterman received his mail when he was traveling.

486.    A Board acting with due care would have immediately recognized this as a clear disclosure rather than an omission.

487.    Other questions on the questionnaire related to blackmail were entirely irrelevant. Peterman had disclosed the relationship to the Board and had already passed a U.S. Department of Defense polygraph test, confirming that he had no vulnerabilities to blackmail.

488.    Furthermore, not a single question on the form required the disclosure of an open marriage or a consensual relationship with a subordinate. And Comtech had no policies requiring prohibiting them or requiring such disclosure.

489.    Any reasonable director would have questioned Clark's motives, taken time to investigate, and discussed these matters directly with Peterman. But Comtech's Board did not.

490.    Clark learned that Waldman had previously lied to the Board regarding the forced retirement of Comtech's long-time CEO and Chairman following White Hat's initial $100 million investment in the company.

491.    Clark discovered through Board minutes and internal emails how Waldman and Chambers orchestrated the removal of this CEO within 24 hours, a move that widely seen as abrupt and unjustified.

492.    While reviewing files and stealing documents, Clark also learned that a former Board Member, CEO and long-time CFO, who briefly served as CEO before Peterman, suddenly and unexpectedly left in 2022.

493.    This former Board Member and C-level executive left just days after delivering a formal written presentation to the Board in which he accused and provided proof that certain Board members were dishonest. Despite having signed a lucrative employment contract just eight months earlier, he left and was paid millions upon his departure.

494.    The Board's past actions demonstrated a clear pattern of recklessness, self-preservation, and willingness to remove executives for self-serving reasons. Recognizing this, Clark exploited her insider knowledge and trusted access to craft her Sham Complaint and demand Peterman's immediate termination, fully aware that the Board would act swiftly and without scrutiny.

495.    To date, through the date of this filing, Peterman has never received an inquiry, request for a meeting, or any communication from the NYDOL or the EEOC regarding Clark's allegations. Comtech has also refused to provide copies of any relevant communications, if any exist.

496.    As of the date of this filing, Peterman has commenced arbitration against Comtech to recover his financial damages. Additionally, Peterman's whistleblowing activities are coming to light.

497.    On October 30, 2024—months after Peterman's wrongful termination—Comtech admitted in its Form 10-K filed with the SEC that it had failed to maintain proper internal controls and had multiple material weaknesses.

498.    In November 2024, two members of the Audit Committee, including Chambers, agreed not to stand for election as part of a settlement with a new activist shareholder group that became aware of Peterman's whistleblowing activities.

499.    On December 11, 2024, Comtech failed to timely file its Form 10-Q with the SEC, citing anticipated "significant changes," including with respect to an accounting item that Peterman had specifically raised concerns about.

500.    In late December 2024, Comtech capitulated and paid money to Clark.

501.    On January 15, 2025, Comtech announced that it would take a $17.4 million charge to fully reserve a receivable, which was one of the topics of Peterman's whistleblowing concerns for which he was retaliated against by Comtech for reporting.  Comtech also announced it terminated the CEO who replaced Peterman.

502.    Comtech has refused to advance and make payments under its Indemnification Agreement.

503.    On January 16, 2025, the U.S. Department of Labor opened an investigation into Comtech pursuant to the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, following Peterman's whistleblowing activities—which predated Clark's fabricated allegations and were known to the Board at the time of his termination.

504.    In February 2025, Comtech announced that it added a new independent director.

505.    Plaintiff incorporates by reference all factual allegations set forth in the Nature of the Action section of this Complaint, to the extent they are not otherwise included in the Factual Background and Allegations Sections, as if fully stated herein. These allegations provide additional factual support demonstrating the Board's reckless disregard for the truth, self-serving motivations, and breach of its fiduciary duties to shareholders and Plaintiff.

## CAUSES OF ACTION

**COUNT I – TORTIOUS INTERFERENCE WITH CONTRACT**

506.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

507.    Plaintiff had valid and enforceable contracts with Comtech, including but not limited to his Employment Agreement and Indemnification Agreement, which entitled him to salary, bonuses, stock options, severance, and legal indemnification.

508.    Defendant was fully aware of Plaintiff's contractual rights and obligations and intentionally interfered with these agreements without justification by fabricating false allegations, publishing defamatory statements, and demanding Plaintiff's immediate termination "For Cause," as defined in his Employment Agreement.

509.    Defendant's knowingly false and malicious allegations directly induced Comtech to breach Plaintiff's Employment Agreement by terminating him For Cause, depriving him of significant compensation and benefits.

510.    Defendant's wrongful conduct also caused Comtech to breach its Indemnification Agreement with Plaintiff, forcing him to personally fund his legal defense for actions taken in his capacity as Comtech's CEO and Chairman.

511.    Defendant's interference was intentional, unjustified, and motivated by malice, constituting tortious interference under New York law.

512.    As a direct and proximate result of Defendant's unlawful interference, Plaintiff has suffered no less than $6.0 million in lost compensation and stock benefits, at least $200,000 in legal costs to defend himself due to Comtech's refusal to honor its indemnification obligations.

513.    As a direct and proximate result of Defendant's unlawful interference, Plaintiff has suffered permanent reputational harm, severely impairing his ability to secure comparable employment in the defense and telecommunications industries.

## COUNT II – DEFAMATION PER SE

514.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

515.    Defendant knowingly published false, malicious, and defamatory statements concerning Plaintiff in her Sham Complaint, including but not limited to:

- Peterman sexually harassed, sexually assaulted, sexually trafficked and discriminated against Plaintiff [Ashley Clark]."

- "Peterman kissed her [Ashley Clark] on the lips without her consent."

- "Plaintiff [Clark] was forced to perform oral sex on Mr. Peterman."

- "Mr. Peterman sexually assaulted Plaintiff without her consent."

- "Plaintiff [Clark] was forced to engage in unwanted sexual intercourse."

- "Plaintiff [Clark] was forced to engage in unwanted sex with Mr. Peterman."

- "Peterman began to sexually assault Plaintiff [Clark]."

- "Peterman had previously engaged in sexual harassment with another subordinate employee—his second wife."

516.    Defendant also knowingly published additional false, malicious, and defamatory statements concerning Plaintiff's alleged workplace misconduct, coercion of subordinates, violations of corporate policies, and fabricated claims implicating third parties.

517.    Defendant knew or was grossly reckless in not knowing that these statements were entirely false and designed to cause maximum harm to Plaintiff's career and reputation.

518.    Defendant's false allegations were widely disseminated within Comtech's executive leadership, Board, and employees. These allegations were further republished to third parties, including individuals working with Comtech, and were distributed to media outlets through Comtech's agents, amplifying the damage to Plaintiff's reputation.

519.     Defendant acted with actual malice, knowing her statements were false or recklessly disregarding their truth.

520.    Defendant's Sham Complaint was falsely labeled as a federal lawsuit, yet it was never filed in any court, demonstrating its true purpose: economic coercion and reputational destruction. Instead, it was sent to Comtech, knowing or being grossly reckless in knowing that Comtech would react and issue a voluntary public statement in response.

521.    Defendant's Sham Letter and Sham Complaint were republished widely and are not subject to any form of privilege under New York law.

522.    Under New York law, Defendant is liable for defamation per se because her statements falsely accused Plaintiff of serious criminal offenses—including sexual assault, sex trafficking, and sexual harassment—which are inherently defamatory and require no proof of special damages.

523.    As a direct and proximate result of Defendant's false and defamatory statements, Plaintiff suffered severe reputational harm, particularly in the defense and telecommunications industries, loss of employment, economic damages exceeding $6.0 million, extreme emotional distress, and personal humiliation.

## COUNT III – DEFAMATION BY IMPLICATION

524.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

525.    Defendant knowingly created a false and defamatory implication that Plaintiff engaged in serious criminal, professional, and ethical misconduct.

526.    Defendant's Sham Complaint was falsely labeled as a federal lawsuit, yet it was never filed in any court, demonstrating its true purpose: economic coercion and reputational destruction.

527.    Defendant's Sham Letter and Sham Complaint were deliberately framed to suggest that Plaintiff engaged in sexual misconduct, criminal acts, and serious ethical and professional violations without explicitly stating so, constituting defamation by implication under New York law.

528.    Defendant knew or was grossly reckless in not knowing that her false allegations would trigger Comtech's defamatory press release, which strongly implied that Plaintiff was terminated due to sexual misconduct, criminal behavior, and serious ethical violations—without explicitly stating so.

529.    The false implications in Defendant's Sham Letter and Sham Complaint were republished widely to third parties and were not subject to any form of privilege under New York law.

530.    The false implications in Comtech's defamatory press release, which were not subject to any privilege under New York law, were disseminated to individual investors, customers, and the public, further amplifying the reputational damage.

531.    As a direct and proximate result of these defamatory implications, Plaintiff suffered extreme financial and reputational harm.

**COUNT IV – ATTEMPTED COERCION & WRONGFUL INTERFERENCE**

532.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

533.    Defendant, through her attorney, delivered the Sham Complaint directly to Comtech and Plaintiff, knowing that its sole purpose was to coerce an immediate termination and settlement rather than to initiate a legitimate legal action.

534.    Defendant's Sham Complaint was falsely labeled as a federal lawsuit, yet it was never filed in any court, demonstrating its true purpose: economic coercion and reputational destruction.

535.    Defendant strategically timed her false allegations to (1) force Comtech to terminate Plaintiff without a meaningful investigation, (2) induce Comtech to breach Plaintiff's contractual agreements, and (3) coerce a financial settlement through economic duress.

536.    Defendant's conduct constitutes attempted coercion and wrongful interference under New York law.

537.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered termination of his employment, financial losses exceeding $6.0 million, permanent reputational damage, severe emotional distress, and public humiliation.

**COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

538.    Plaintiff incorporates by reference all prior allegations as if fully set forth herein.

539.     Defendant made these false allegations to third parties with the deliberate intent to damage Plaintiff's personal relationships and maximize his public humiliation.

540.     Defendant's conduct was extreme, outrageous, and exceeded all bounds of decency, making it utterly intolerable in a civilized society.

541.     As a direct and proximate result of Defendant's intentional and malicious conduct, Plaintiff suffered severe psychological and emotional trauma, requiring medical treatment, extreme financial losses, and public disgrace.

## COUNT VI – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

542.     Plaintiff incorporates by reference all prior allegations as if fully set forth herein

543.     Defendant owed Plaintiff a duty to exercise reasonable care and to refrain from reckless, malicious, or grossly negligent conduct that would foreseeably cause severe emotional harm.

544.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe and lasting emotional harm, for which he is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and grant the following relief:

**(i)  Compensatory damages**

- Award Plaintiff compensatory damages in an amount to be determined at trial, but no less than $6 million, for lost earnings, reputational harm, emotional distress, and other economic and non-economic damages caused by Defendant's wrongful conduct.

**(ii)  Punitive damages**

- Award punitive damages in an amount sufficient to punish Defendant and deter similar misconduct in the future, as Defendant acted with actual malice, gross recklessness, and deliberate indifference to Plaintiff's rights.

**(iii)  Declaratory Relief**

- Issue a declaratory judgment that Defendant's statements were false, defamatory, and made with actual malice, and that Defendants' actions constituted defamation per se, defamation by implication, coercion, intentional infliction of emotional distress, conversion, and tortious interference with contract.

**(iv)  Injunction Relief**

- Issue a permanent injunction restraining Defendant from further publishing, disseminating, or republishing any defamatory statements about Plaintiff, whether directly or indirectly;

- Interfering with or taking any action to prevent Plaintiff's enforcement of his contractual rights, including his Employment Agreement and Indemnification Agreement;

- Conspiring with or inducing Comtech, its Board, or its representatives to further retaliate against Plaintiff or impede his ability to receive compensation, indemnification, or other benefits owed under his agreements.

### (v) Retraction and Public Statement

- Order Defendant to issue a formal public retraction and corrective statement clearing Plaintiff's name and publicly acknowledging that the defamatory statements were false and misleading.

### (vi) Attorney's Fees and Costs

- Award Plaintiff reasonable attorneys' fees, court costs, and litigation expenses incurred in prosecuting this action.

### (vii) Prejudgment and Post-Judgment Interest

- Award prejudgment and post-judgment interest on all monetary damages at the maximum legal rate.

### (viii) Such Other and Further Relief

- Grant such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on

all issues so triable.

Dated: New York, New York
        February 25, 2025

**KAISER SAURBORN & MAIR, P.C.**

By:_____
    Daniel J. Kaiser, Esq.
    William H. Kaiser, Esq.

    Attorney for Plaintiff
    30 Broad Street, 37th Fl.
    New York, New York 10004
    (212) 338-9100